Louisiana v. Biden, Mr. Pullum. Good afternoon, and may it please the court, Thomas Pullum for the appellants. A fundamental problem with the plaintiff's challenge here is that the interim estimates by themselves, as both the state panel of this court and the Eighth Circuit recognized, do nothing to the plaintiff's states. Any injury now is merely hypothetical, contingent upon future agency action that may never come. And even if it does, right now it is purely speculative that a future regulatory burden would be fairly traceable to the interim estimates themselves. Plaintiffs worry that the estimates will be used in the future to justify increased regulatory burdens. But if that happens, the injury in fact would be caused by that future regulation itself, and the plaintiffs could challenge that regulation in the appropriate court in the normal course. Indeed, several of the plaintiffs have already done so, seeking judicial review in the D.C. Circuit of an EPA rule governing vehicle emissions. Several of these state plaintiffs have done so? That's correct. And that case is, is that the Midwest, which, what's that case? I apologize, I don't have the name handy. It's a challenge to the EPA emissions for the light duty vehicle standards, 2023 standards. And they're challenging? And I believe I have the docket numbers 22, 10, 31. They argue that reliance on the working group estimates made the EPA rule arbitrary and capricious. They also, I believe, submitted comments in that regulatory proceeding. That's cited in our brief. The Supreme Court just recently heard a case from our court, U.S. versus Texas. One salient issue there is state standing. Are we, as a panel, still bound by the Fifth Circuit panel decision? Of course, there was a split, you probably remember. Would you say that we're bound by the Fifth Circuit panel decision and are you comfortable with that assessment of state standing? I believe until that, I mean, the judgment hasn't been vacated by the Supreme Court. So we're bound. Are you familiar with the Fifth Circuit panel decision and how it assessed state standing in that case? The reason I'm asking is the HHS guidelines, their immigration guidelines, it's more of a national prerogative, but our court still did find state standing to assess those and those were seen as internal guidelines per ICE, and yet we found state standing. The circuit that split with us, Chief Justice Sutton didn't see it, but that's in front of the Supreme Court. Will that case illuminate where we are? I'm not sure that it does because I think there are several reasons here why standing is lacking. We have problems with both the injury in fact and with causation, and I'm happy to run through each of those. As the state panel of this court recognized, without any kind of concrete and particularized injury to the state itself, it's left with only a generalized grievance about how the current administration. I'm just going to cut you off because of time, even though you've got extended time. This was argued extensively by Mr. Knapp for the government to the district court about a year ago, right? Yes. When I read that hearing, you probably did too, the primary answer that I saw from the plaintiffs was, well, the executive order from the president says shall use, and just that imperative means that they are presently being used. So they are presently being used. We have never disputed present use, but use of the interim estimates alone is not enough to create a cognizable injury. It would have to be a use by the agency to justify a regulatory action that itself causes some concrete harm. The district court then asked Mr. Knapp, as an officer of the court, can you tell me there is no project that has been rejected or limited by virtue of use of these interim estimates? You remember his answer was no. Then the district court insisted that that was a, do you don't know? But he did, to my reading, repeatedly say no. That was a year ago. Can you stand before us today and still say that there is no final agency project plan that has been imposed or denied based on use, material use of the interim estimates? There certainly is not one that I know of, and this is a burden that falls on the plaintiffs as the party attempting to invoke this court's jurisdiction. As the Supreme Court has pointed out in Summers, for example, and repeatedly since then, it's the burden on the plaintiff to demonstrate that that particular plaintiff has such a personal stake in the controversy to justify his invocation of federal court jurisdiction. Our panel looked at it, and then there was an en banc motion, and no one did seem to see it. But on the other hand, the district court did list 14 different regulatory actions. And you're, would you say there's any one that's closest to implementation? I mean, we can talk about the three that the plaintiffs have pointed to, because I assume they have kind of. Sifted and. Exactly. They pointed to three different injuries here. One was, they suggested that the executive order requires them to use the interim estimates in cooperative federalism programs. I'm pointing specifically to an EPA rulemaking under the NAAQS program. As the state panel noted, the executive order does not require the states to do anything. It specifically requires agencies to use the estimates in certain circumstances. But isn't it entirely foreseeable that when the agency uses those interim estimates, they're going to go to the states and say, no, your proposals are not going to work because you've got to go back to the drawing board? Not at all. This is fleshed out in our brief and a little more in the amicus brief by several states. I think New York is the main named party there. So with respect to this program, this NAAQS program, it deals with smog and precursors to smog. It does not address greenhouse gas emissions. And when state plans are assessed under that program, they are assessed with respect to their effect on those other chemicals. Now, in the course of this rulemaking that the plaintiffs cited, EPA conducted a cost-benefit analysis for informational purposes to find out how their action would affect various factors. But when it came to actually making a decision, the agency was quite clear on this. The agency said in response to a comment that information from the working group used to estimate climate benefits is not relied upon as part of the record basis for this rulemaking. And indeed, in that rulemaking, the EPA did not reject any state plans. State plans had been rejected previously, and that was discussed in the rulemaking. But there's a total disconnect there between the actual agency action that involved, at a prior stage, use of the interim estimates and the effect on the state plans. And I'd further note that this rule that the plaintiffs cite is currently subject to litigation in the D.C. Circuit. Is that the Midwest ozone case? I believe that's the—the plaintiffs are not—they did not petition for review of that rule. That is the litigation as to those NACs. I believe so. I believe so. So one would think that if the plaintiffs were, you know, forced to do something that they were unhappy with, they would have sought review of the rule that in fact imposed that burden. They did not. And I think that underscores the disconnect that we see throughout this case. A second injury that the plaintiffs relied on were oil and gas lease sales. They cite one involving Utah, which is not a party to this case. Plaintiffs don't explain how any loss in revenues to Utah would give them standing. But even putting that aside, there are some other fundamental reasons why similar actions of this kind would not give rise to a cognizable injury. One is the executive order does not require use of the interim estimates. Well, in the Utah example, in addition to there being no current plaintiff, isn't that a case again where the BLM said that what it was doing wasn't based on the interim? Quite right. Quite right. In the final decision, the BLM there said it analyzed the emissions and social costs for informational purposes only and had not determined to lease individual parcels or not based on greenhouse gas emissions. So that was kind of one of a series of reasons why those don't supply, that action doesn't supply a cognizable injury. Will it always save an agency if they just put in that disclaimer? In other words, what if the disclaimer is a false disclaimer just because they said it wasn't material to our outcome? It can't be that the government always prevents federal jurisdiction. Well, I think there's some kind of fundamental principles of administrative law here that are relevant. The Supreme Court dealt with kind of a situation like this in the Department of Commerce case. The court there pointed out that a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the administrative agency record. And in that case, there was an extensive record that demonstrated that the agency stated reason. There was, in the court's words, a significant mismatch between the stated reasons and what the record demonstrated were the actual reasons. So you're saying in this specific litigation, like, for example, the Bennett v. Spears case, if the agency were being duplicitous, that could get ferreted out? Exactly right, exactly right. In the normal course, agencies are given a presumption of regularity, and the plaintiff must come forward with some showing to dislodge that presumption and provide evidence that the agency's actual reasons are not what were in fact stated. But again, that would happen on a case-by-case basis, looking at the particular administrative record supporting a specific action that is alleged to harm the plaintiff's interests. You can't do this kind of all at once through a more generalized attack on the interim estimates before they are actually used. What about the plaintiff's argument that they can't effectively challenge the interim estimates any other way? In other words, it's going to be baked in the cake. By the time the specific rule shoots out the other end of the regulatory process, it's too late. They're not going to be able to challenge it. And they make other arguments like the estimates are binding the interagency working group as an agency itself. I mean, but those are sort of maybe subsidiary to what I'm asking. They say that effectively it's now or never to be able to challenge these. I mean, I suppose I just don't see how that could be. Anytime the interim estimates are used to support an agency's proposal, that action will be presumptively subject to notice and comment. The agency's cost-benefit analysis as part of its RAA will be published alongside the proposal, and any interested party can comment. Many parties do comment on these significant agency actions. The plaintiffs themselves have. And as the OIRA guidance that we cite in our brief instructs agencies, agencies will have to respond to any significant comment relating to their use of the interim estimates, and they will have to ensure that their usage of the estimates is not arbitrary and capricious. And we've seen this happen in several of the actions that have been discussed both this morning and in the briefs. For example, in the EPA, the light-duty vehicle standards, EPA said that it had carefully reconsidered for this rulemaking the technical support document. That's the document where the interagency working group published the interim estimates. The underlying studies discussed in the TSD and issues raised by commenters, and the agency concluded that the resulting estimates represent appropriate if conservative estimates for the purpose of this rulemaking. The Department of Energy did the same thing for the manufactured housing rule that the plaintiffs cite. I mean, that was another rule where the Department of Energy said this didn't factor into our determination, but nonetheless the department responded to the comments and explained why it thought that the interim estimates were appropriate in that situation. So the plaintiff states, and indeed any party that has an interest in agency rulemaking, will have an opportunity to comment on the use of the estimates in that particular context, and if they're dissatisfied with the agency's final decision, they can seek review in the normal course. The state panel noted that, that there was no obstacle to the plaintiffs seeking review of any rulemaking that causes them harm in the future. I mentioned Bennett before. That was urged by the plaintiff states more in the Missouri litigation than it has been here, but could you speak to it a little bit, because that rule was advisory, and yet still the plaintiffs, they are the ranchers, were found to have standing. Yeah, so there are a couple significant differences. One in Bennett v. Speer, that involved a very concrete dispute about a specific, I believe it was an irrigation project that had to do with water usage, affecting the particular party before it. And then I think more relevant to, for your Honor's question, is that the Supreme Court explained that the biological opinion in that case had a coercive and determinative effect on the subsequent, the action agency's approval of the, I forget if it was a permit, whatever the action was, the action agency's decision, because it changed the legal landscape in a very specific way under the Endangered Species Act when a biological opinion imposes conditions. So it's like an Army court jurisdictional determination. I mean, it's even more specific than that. It makes, the biological opinion sets out terms and conditions for the action agency's action, and if the action agency personnel deviate from those, they violate the Endangered Species Act. So it exposes them to criminal sanction. So it altered the legal landscape in a very concrete way. Here, there is no such determinative or coercive effect of the executive order. It says on its face that it doesn't affect or impair the authority of any agency. It's a shell. Yeah. It certainly changes the landscape to go from national consideration to global. So I don't think so, and I'd like to take a minute to explain why, that what is the kind of subject of the shell there. This is part of the President's Article II authority to supervise agency rulemaking and to require cost-benefit analysis. The plaintiff states don't take issue with the President's authority to require a cost-benefit analysis. So basically what the President has said is in conducting this cost-benefit analysis, I want you to use certain figures to account for the social cost of greenhouse gas when you monetize those effects. This does not dictate what an agency does when it later exercises its regulatory authority. In that circumstance, as the OIRA guidance explains, the APA's various requirements apply. And so the agency has to ensure that its usage of the, or that any usage of the interim estimates is supported by the administrative record, that it's explained reasonably, and that the agency has responded to comments. So nothing in this executive order requires the agency to regulate or not, to support any regulation with a cost-benefit analysis, or even if the agency uses a cost-benefit analysis, to actually use the interim estimates in that cost-benefit analysis. If the agency gets comments that say, you know, I think you should use these other numbers, which are better supported, and the agency agrees, the agency is required by law to use that other set. So these are the kind of numerous contingencies that have to come to pass before there can be any effect on a regulated party. If there are no further questions, I'm happy to reserve the rest of my time for rebuttal. Thank you, Counsel. Thank you. Ms. Merle. Thank you, Your Honors. Good afternoon. Liz Merle on behalf of the state petitioners. The government's position, in a nutshell, is that the president, without any statutory authority whatsoever, can superimpose a requirement to measure purported climate damage caused by virtually every action taken by any entity with business before the federal government. This is not just an academic math exercise, and it is not confined to the cost-benefit analysis performed within OMB. He created his own little mini-Congress by cobbling together all of his cabinet members, and then he directed them to issue a binding economic metric. It's not optional. The number itself is not challengeable by other agencies. They don't have the discretion to redraft the internal working group's work, and the internal working group is relying on information that comes from outside the government. Can't those numbers and the way they were prepared, though, be challenged during the rulemaking process, agency by agency, like the government's position? When you challenge an individual rule, you challenge the individual rule and whether or not it is arbitrary and capricious. Right. So that doesn't get us to the heart of the question of these metrics, how they were created, and how they're being used. Why not? Because the antecedent question is whether this is a rule itself, and we have standing because we've demonstrated that they are being applied across the entirety of the government. Our evidence in this case, which Judge— When you say they're being applied across the entire government, that was a little bit the statement that was made in district court. This is a freight train, and you don't have to wait until it hits. Correct. And in district court, the answer to don't you have to point to something specific, the answer was we're not going to play whack-a-mole. Well, I think the answer was we don't legally have to play whack-a-mole if this amounts to a rule. If this is a rule, and you think of it like the head of the hydro, why do we have to go shoot every snake that comes off the hydro? You have to establish that there's federal jurisdiction. So you've got to—you put in your own brief the citation to Lujan, page 34. You said, Lujan stands for executive actions that bind agencies to certain course of action are immediately reviewable. This is your brief. If, as a practical matter, it, the agency action, requires plaintiff to adjust his conduct immediately. And this does. Okay. So what is the single best example, either from the district court's list of 14 or other in the record, where you, the plaintiff's state, had to adjust your course of conduct immediately? I think the single best example of that is the, I think it's a giant affidavit, the record on appeal in 3767. That's one example. I think the BLM fact note is— Don't start moving to others. Tell me exactly what agency and what rule and how the state was affected by that. South Dakota highway fines will depend on the GHG analysis, which depends on, and the executive order is being applied through federal highways. Okay. Is that one of the 14 the district court listed? I don't remember the South Dakota example. I don't think it was one of the ones that he listed. He referred to BLM using that. So I guess my first question is tell me which is the best that you urged to the district court that it then validated that presumably you would say our panel then overlooked and that presumably you'd say the Sixth Circuit panel overlooked. So oil and gas leasing and environmental impact studies that are involved in that. Counsel, I'm going to say again, I don't want to hear they're just cooperative federal programs out there. So it's not just going to be oil and gas leasing across the country. Impact as to a specific oil and gas lease that was rejected by use of these estimates so that your tax revenue is going to go down, royalties will go down, rents. Describe the specific one and tell me if it was one that the district court identified. No, Your Honor, there are not examples of a specific lease being rejected other than the declarations related to, I mean, the exhibits related to Wyoming. So Wyoming had a number of lease sales that were reduced because of the environmental impact and because the BLM started conducting this new greenhouse gas emission and applying them through NEPA. So I'm just going to have plenty of time, so just is that Wyoming example? Because I don't want to play whack-a-mole. Is that one the district court pointed to? Is Wyoming a plaintiff state here? And did the BLM say our decision here was based on the interim estimates? Those are three different questions. Was it in the district court list? Oil and gas leasing was in the district court list. Not oil and gas leasing. No, I cannot, my answer is limited because I don't have the opinion, the list of every item that he relied on in front of me. Okay, so I guess I'll go back to the best example of final agency action that has caused concrete injury to a plaintiff state in this case. Your Honor, it is the use of the numbers by the agencies that causes us harm. It increases our regulatory costs. Absolutely. When we have to go out and find every single place they are using this, when we have to redo our environmental impact studies. So, okay, let me ask the question differently. Did the Eighth Circuit that ruled against you, which we were notified by 28J by opposing counsel, you have not filed a response yet. Did that court make a mistake that was similar to our motions panel's court? That case was different from our case because they did not have the declarations that we had. Very different case. In other words, they . . . Very different record. It was not brought to their attention that there was a specific concrete injury. Correct. Okay. And in this case, you're pointing to which one that affects a plaintiff state? I thought you began to just say you don't have to. Well, I mean, I think we've pointed to the application of BLM across the board to all their oil and gas leasing program, of which we are a part. But has it happened yet? We have not had the opportunity to conduct jurisdictional discovery to determine the extent to which they are applying these numbers to our particular oil and gas sales. We have shown that they applied them in several different environmental impact studies. The plaintiffs would know if leases were allegedly denied, reduced, eliminated, curtailed, whatever the right harm is. Judge Wilson, they initially denied a capacity to know that. That's the colloquy that you, Judge Higginson, identified in the record at oral argument and said, well, we can't know that. We don't know. No. We don't know if they're being used. Counsel, stop. That is not how I described it. The district court said that the government's response was, I don't know. The government attorney kept saying, I'm not saying I don't know. I'm telling you no. There is no project that I know of, and it's the plaintiff's burden. The district court kept interpreting that as, I don't know, maybe. I did not read that in Mr. Knapp's statement. Well, Your Honor, he said over and over again, he asked him over and over again, do you know if they're being used? And he said, so you don't know, so you don't know. I mean, here's the transcript. I've read it very carefully. The district court kept characterizing his answer as, you don't know. But the government attorney stated as clearly as Mr. Pullum stated today, I don't know of one. It's not that he's unsure. He knows of none. And then when we showed an enormous application of this executive order across the board through all of these agencies complying with the directive of SHOW, and the district court judge issued the preliminary injunction, they came to this court with a declaration that announced miraculously that they did know how and that they did figure it out by getting a declaration from the OMB director who announced that they were using it across multiple agencies in environmental impact studies, in oil and gas leasing, so well beyond the confinement of a simple cost-benefit analysis. And that has been our point all along. The plain language of the executive order says you shall use it not only in cost-benefit analysis and rulemaking, but in other decision-making. And we don't know the scope of that. But we have seen that they are applying it as broadly as the president directed them to, and that affects us and causes regulatory costs to us. I'm sorry. This occurs to me, counsel, as I'm sitting here thinking about this. So the president has at least some authority to do this. And where I'll start from is he won the election. In other words, where do we draw the line between the position that this is a rule and the president's general prerogative to direct the executive branch where the president wants it to go? In other words, policy priorities, this sounds like a policy priority, not a rulemaking by some interagency group. So where do we draw the line? Assume you're right this is a rule. How do we limit it to not eviscerate the president's authority under Article II? Judge Wilson, there is precedent that you can look to that defines whether or not it's a rule or a policy. It's not interpretive. There is no statutory authority. They have never cited one other than they have capacity to do a cost-benefit analysis, and this exceeds that. But that was a cost-benefit analysis that's been done for, what, 40 years or more? But this is more than that. Okay. How so? Because they're applying it across the board to evaluate the damage of climate change, not the cost exclusively of rulemaking. That is an entirely different thing. But the argument is that it captures better the cost of rulemaking, relatively speaking, cost and benefits. This sounds like a policy dispute, so how am I wrong about that? Because if it were only confined to a cost-benefit analysis, then it would just be a math exercise internal to the government, but it's not. And they've demonstrated, and we've demonstrated, that it's not setting precedent. They're capturing economic externalities, are they not? They are predicting 300 years of global climate damage based on an actor who has come to the federal government for a permit or for some other decision. It's not just rulemaking. That's, I think, part of the point of showing that it's being applied in permitting and leasing decisions. It's not just cost-benefit analysis on rulemaking when you're accounting for it in NEPA. NEPA has a number of different decisions embedded in it that we can't challenge and we can't get judicial review over, like the decision about whether it has significant effects or not. Applying this metric to that makes everything have significant effects because the numbers are so large. And so it absolutely puts a weight on the scale. If we had a scale in front of us, it puts a 51-per-metric-ton weight on the scale for every metric ton of carbon, and they just tripled those numbers. I think the problem is they're admitting it's being used. The president said use it. But they're saying there is no—you just mentioned NEPA. There's no application of NEPA according to these metrics that has yet led to a project being denied. When that happens, you can litigate it. I think that still begs the question of whether this is a rule. If this is not a rule, do you lose? They're having to challenge every time they implement it, but it is a rule. And if you look at this precedent on what constitutes a rule, then I think that it resolves that question. It sets a specific monetary value, and it directs that it be used. It has sweeping application, and it implicates political, ethical, and behavioral choices. The Catholic Health Initiatives v. Sebelius case is a good one to look at, I think, with regard to making that analysis. I'm trying to get past standing before we get to it. So I guess—let me ask this differently. Instead of a concrete, specific example, because I guess you're saying you want to hypothetically assume jurisdiction until you get discovery. Instead of giving us a concrete example, what's your strongest Supreme Court case? Because the district court cited the case I brought up with them, Texas v. U.S., as to state standing. The Eighth Circuit considered Bennett v. Spears. What would you point to as one, your strongest authority, that these are already inflicting concrete enough injury that you have standing? One of those two cases or something else? Well, there are several cases. Trump v. Hawaii was one. We've got a number of cases, not just at the Supreme Court, but also in the other circuits involving Trump executive orders. In fact, in virtually every Trump executive order, there was a challenge, and it was permitted to proceed. What's the strongest Supreme Court case that you've shown under Lou Jan that you have an immediate or present or imminent injury? The one that I have listed in my notes was Trump v. Hawaii as the top Supreme Court case. We also have Texas v. United States, which is the Fifth Circuit case. And that's still binding to us, even though they've granted cert, right? Excuse me? There's a split there, correct, in Texas v. U.S.? Yes. Chief Judge Sutton said no state standing. Our court said yes. We're bound by our court. But in that case, do you have anything equivalent to the findings the district court made that our court then affirmed as not being clear error that the guidelines HHS is using has meant specific numbers of aliens have been released and caused criminal impact for states, and specific numbers of aliens have been used by what they called as guidelines that were, quote, engraved in ICE behavior, engraved. And the district court was very careful to then say, this has cost Texas $11 million of health care funding for aliens that shouldn't be in the U.S. I don't see any of that in this record. Do you have anything that is like these crimes have been committed, $11 million of school and health care, because ICE took a policy of its and didn't send aliens away? Your Honor, no. I mean, I think that because this has never been done before. The prior executive orders that implemented this, and I can't find any executive order that equates to what President Biden has done with this one. It is very, very different quantitatively and qualitatively, and its impact is different. So it does, I think, approximate what happens with the immigration context where they issued priorities memos and they changed the way they were handling all of that. Now, he has more discretion when it comes to immigration. This, when you look at this, there is no statutory authority. They've never identified anyone. There still has to be standing, and the district court was so careful to make findings that our court reviewed for clear error. And he referenced specifically a number of the exhibits that we filed, but we had an enormous amount of evidence in this case that backed up the injunction. He made findings because of the totality of that evidence that showed that they were, in fact, applying it across the board. And, Your Honor, I would also point you to the city of L.A. v. Lyons. That's a United States Supreme Court case, and it says the states would not need to have already suffered the injury but show a threat of future injury. So we have a concrete, imminent threat. We have demonstrated with a mountain of documents that they are applying it, and then they came to this court and acknowledged they were applying it. So it baffles me that we have to come and show every specific denial or when they are, in fact, using the numbers, and it does beg the question of whether this is a rule, because if it is a rule, then they have to have statutory authority for it, and they've cited none. The only thing they rely on is the cost-benefit analysis authority of the president, and they have exceeded that in the way that they're using it. So we also have an ultra-virus cause of action, and we have demonstrated the use of the executive order across the board in that. And I think that just the application of it gives us standing to attack it as ultra-virus. And so we have multiple causes of action. He cited with a docket number, and I didn't write it down exactly, 22. It is challenging the EPA rules that were based on the interim estimates. I'm sorry, I didn't follow you. Remember opposing counsel when we asked him the same question. If the logic is you have to wait until there's actually concrete injury, he's suggesting that's actually happening in the D.C. Circuit now. He's suggesting that we have the capacity to challenge an individual rule and get to it. The plaintiffs are doing it now. We are attempting to challenge a specific rule and take down that rule as arbitrary and capricious. That is similar to litigation that occurs all of the time on both sides of the fence. So that doesn't take down the metric. It takes down the rule itself. That will never stop us from having to go out and shoot every single head that comes off this hydra. So the question is whether it's a rule in and of itself or we have to go out and find every single application of it and pursue it to attempt. I don't understand it, though. If you attack a rule that is grounded on the metric and the metric falls because you've shown all these things in a specific rulemaking, how does the metric survive elsewhere? Because the court's not obligated to rule on that particular claim. They could find that it's arbitrary and capricious on something else. If the metric is flawed, though, I'm just failing to see how that doesn't accomplish what you're trying to accomplish here. Because we would have to pursue every single time we can find that they are using the metric and hope that the court actually rules on that particular claim and doesn't dispose of the case on the merits on some other claim. So we don't necessarily get to that claim if the court rules on some other basis. And so we just have to keep going out and challenging every single time they use it. Your position is based on things we don't know right now. They're contingencies. Our position is that the president has created a rule, that the internal working group itself is acting as an agency and it has created a rule. What's your best authority that that is factual, that's accurate? I think the best authority that we have that would support our position that it is in fact a rule is Catholic Health Initiatives v. Sebelius, 617 F. 3rd, 490. I would also cite you to states, and I'm not sure I'm pronouncing this particular name, but Pichiatto, 875 F. 2nd, 345. These are both D.C. Circuit cases. And there are a couple of others in the D.C. Circuit that talk about whether something amounts to a rule. And it doesn't have to be an agency that was created by Congress to be acting in a manner that subjects it to the APA and to rulemaking. And that's the argument that we have made here, that he's created this working group, they've created a binding economic metric. And another case I would cite you to is U.S. v. Riccardi, 989 F. 3rd, 476. That's a Sixth Circuit 2021 case. When an agency wants to state a principle in numerical terms, terms that can't be derived from a particular record the agency is legislating and should act through rulemaking. It's a basic principle of rulemaking, and we have an injury just on the procedural injury of not being able to actually engage adequately in notice and comment on this entire process on the social cost of carbon. But what's the line here? I mean, the states don't get notice and comment every time the president wants to set a policy priority. And there are other interim or interagency working groups across the executive branch. That's been the case, again, for years and years and years. I'm not aware of any that have been challenged or held to be an agency. Are there cases like that? Yes, there are cases like that. So there's an entire line of cases that talks about it. Now, these cases predominantly fall into fights over FOIA, but they look at whether something is an agency pursuant to FOIA and has to comply with the APA because it amounts to an APA agency. And those cases talk about whether it exercises substantial independent authority and how close operationally it is to the president. They generally fall on a line of whether the president, they're just advising the president and they have no other impact. And so those are not agencies. But if they have substantial independent authority, they are. And so then they're subject to FOIA and they're an APA agency. And so I think here really the antecedent question is whether it's a rule, but you can also look at the question. We argued it was an agency. The district court judge found that it was an agency subject to the rulemaking restrictions. It's not complying with those. Even the executive order said you should publish this, and they didn't publish the interim numbers, and they haven't adequately published any subsequent revision of those numbers through the working groups. So these questions do kind of relate. They interrelate into whether it's an agency and whether it's a rule. But the question of whether it's a rule is really the one that determines whether they have to comply with the APA and whether we can challenge it directly and not have to wait just to see how it is applied through every agency, because it alone is challengeable. And that's been our position all along. And we did demonstrate that it was being used widely. And we do not have to demonstrate that the economic system will collapse before we have standing. And so we are subject to the application of it. And I think that it is absurd for the government to take the position that they're not when they filed a declaration that shows just how widely they are using it. I would like to address ‑‑ Is it your position that the executive order mandates federal agencies to consider the interim estimates? Yes. And I think the savings clause is entirely what they rely on to say that it's not mandatory. If your answer being yes, then through what mechanisms are the federal agencies forced to use the estimates? By operation of the mandate in the executive order, which our evidence demonstrates they are, in fact, following. Are there any penalties on the federal agencies for failing to consider the estimates? I guess I don't have an answer to whether or not there are direct penalties on the agency. I think the penalty on the agency for not properly promulgating rules that they are using them is vacature. But the agencies haven't put out any rules themselves. They're all defendants in this because they're all members of the internal working group. But they haven't ‑‑ none of them have issued rules that would declare that they are, in fact, applying these, how they're applying them, where they're applying them. Tell me if I'm wrong. Why isn't ‑‑ why wasn't Chief Judge Sutton right that you've lost it right there? If you say they haven't yet put out a rule, that's what Chief Judge Sutton, this is a contingent injury. At the moment there's a traceability problem. It may be that federal employees are responding to a presidential you've got to use it. Opposing counsel keeps saying we are using it internally. But we haven't yet issued a rule, as you just said. So where's the traceability to anything happening to the plaintiff's states? Your Honor, our exhibits, the Texas Environmental Impact Study. When you just said no agency has yet issued a rule using these. No, no agency has issued ‑‑ let me just clarify what I said or restate it. Wait a minute. No agency has issued a rule that declares that they are, in fact, applying it, when, in fact, our evidence shows that they are. So it is the duplicity problem I asked opposing counsel. It is. I mean, you know, I didn't ‑‑ in any of these emerging litigations against any one of these uses, if what they're saying is we disclaim that these things were material, and yet you can prove that it was. If it is a rule and we shouldn't, and they are applying it, then the injury is evident by us having to incur all of the increased costs of going out and ferreting this out and litigating every single claim. It is ‑‑ I mean, it's ‑‑ Your Honor, I don't think that you have to suspend common sense to find an applicant that shows that we have demonstrated in all of these, especially in the environmental impact studies, that they're applying it and that that triggers our ‑‑ the necessity that we go out and find out everywhere that it applies in every decision that they're making. That is a very grave statement for you to say that what they're declaring to be true is a lie. I didn't say it was a lie. I said I believe that it is inaccurate and that they have demonstrated through their own declaration that that is not accurate. I didn't say they were duplicitous or that they are liars. I said our evidence shows that it is being used very, very widely, pursuant to the mandate, the shall mandate in the executive order, and that we have challenged ‑‑ plenty of environmental groups challenged executive orders under President Trump for ultraviaries action. We do have that claim pending as well. And so we've demonstrated that it is being applied, and I believe that we have demonstrated adequately that it amounts to a rule under the precedent that defines what a rule is. So I didn't ‑‑ I mean, I think the evidence speaks for itself, and the district court judge specifically evaluated all of that evidence. He made factual findings that informed his conclusions of law, and they are not arbitrary and capricious, and the factual findings are not clearly wrong. They haven't even attempted to demonstrate that they were clearly wrong. So I think that the injunction itself stands because they have not met their burden of showing that it is arbitrary and capricious, which is the overall burden of proof that they have. And on the standing side of things, I think they are flyspecking. They are trying to have this court flyspeck our standing, and that is not what the precedent requires. We have demonstrated over and over that we are being subjected to the application of this. It really, I do think, rises and falls on whether this amounts to a rule, and there's precedent that defines whether something is a rule or not, and it doesn't have to be an agency that was created by Congress. So if you have no further questions, I have 42 seconds, so I will sit down. We'll take that back. Thank you, counsel. Thank you. Final argument. Thank you. There are just a few points I'd like to run through in rebuttal. Counsel for the States repeatedly stated that the critical inquiry here is whether it's a rule, citing some cases that involve the difference between interpretive rules and legislative rules. That framework just doesn't apply here. The government has never advanced the argument that the executive order is the interpretation of a statute. It's an exercise of the president's Article II authority to supervise the rulemaking enterprise of the executive branch. The plaintiffs don't dispute that the president can require cost-benefit analysis. They don't take issue with the legitimacy of Circular A-4, which on their understanding, which to be clear we disagree with, but on their understanding, Circular A-4 requires the use of specific discount rates, 3% and 7%. So on their theory, the president can require cost-benefit analysis and can require discount rates of 3% and 7%, but when the president requires the use of numbers that apply discount rates of 2.5, 3, and 5, somehow that's beyond his constitutional authority and requires congressional action. Even on the plaintiff's own framework with interpretive rules, those cases don't support what they're saying. As I think counsel read an excerpt from the D.C. Circuit's Catholic Health Initiatives case that talks about where a number can be derived from a record, that's not legislative rulemaking. I mean, that's what happened here. They had published peer-reviewed studies that they ran through thousands of simulations and came up with these numbers. They didn't just pluck a number out of thin air. No notice or comment or public input or anything like that? No. Well, there was notice and comment with respect to the prior round of the estimates, and there will be notice and comment, of course, before any agencies apply them to justify a future. But in terms of development of the metrics and the numbers, this was a closed loop? That's not required here. Notice and comment is required. First, that requirement only applies to agencies. The president is not an agency under the APA. Neither is the working group because the working group doesn't exercise any authority independent of the president. They work as assistants and kind of extensions of the president for the specific technical aspect, basically calculating the numbers that accurately capture the cost of greenhouse gases. Well, they accurately capture it based on what was selected by this closed group that is subject to the president. So, in other words, the president can use junk science, partial science, all the science, the best science, but nobody gets to comment on that except within the administration. Certainly. Exactly. I mean, yes, with respect to the cost-benefit analysis that's done for the president's own supervision of the executive branch, yes, that's right, the president and his experts can determine what science will be used. But I think it's worth noting that these estimates then have not been subject to challenge outside sort of the administration's goals and priorities and selection of what they considered. I mean, I get it, it comes out in the wash later is your position, and he gets to do that. It may well be the correct position, but don't overstate it. No. To be clear, there was notice and comment in the first iteration of the working group. These numbers have been put out for notice and comment. The technical support document has been put out for notice and comment, but not before it was promulgated by the working group. That's correct. Another point counsel made was that they shouldn't have to proceed case by case, where kind of attacking specific agency actions. The Supreme Court has been quite clear on this in a number of cases, that case by case is the normal mode of operation for the federal courts, that these kind of programmatic changes that seek wholesale changes in the way that an administration carries out a program, those can't be put before a court for any number of reasons, for standing, for ripeness, and for various sovereign immunity doctrines. This helps keep the courts in their proper role, which is not to act as kind of a roving commission publicly opining on whatever legal question is put before them, but to exercise judicial authority in cases and controversies. I think those are all the points that I had to make. You brought up Trump v. Hawaii as a contrary to that last statement you made. Do you want to address that? That's not cited in their briefs, and I don't remember that case well enough that I'd want to say anything to the court. But you were asking for kind of best Supreme Court authority, so I would like to offer mine. I think Summers v. Earth Island Institute is kind of very close here. There was a regulation that governed only the conduct of Forest Service officials. The plaintiff wasn't the object of that action, and the court said you need to wait until there is a specific action that affects you. You can't rely on this kind of probability or inevitability theory that one day it will happen and it will affect us. Another very helpful case in ripeness is the Ohio Forestry Association case and National Park Hospitality. So I would urge the court to look at those if it hasn't already. And if there are no further questions, we would ask that the district court's preliminary injunction be vacated and that the court render a judgment of dismissal for lack of jurisdiction.  The case is submitted. We have one...